"Totton, J.
delivered the opinion of the court.
' The case is an issue of devisavit vel non, on a script propounded as the holographic will of Thomas Crutcher, deceased; it commences as follows: “Nashville Inn, 25th February, 1844. A list of the property owned by Thomas Crutcher:
*378 3000 acres of land, Dyer county.
640 acres of land in Lauderdale.
133 acres one tract, Davidson,” &c., naming a considerable amount of property, real and personal.
It then continues: “I have several good notes, and I owe but little, when all my just debts be paid. I have four brothers and one sister, John Crutcher, James Crutcher, Edmond Crutcher and Henry Crutcher, and sister Sarah Helm; and Col. John Sneed, my brother-in-law, to him, I intend to give a good suit of clothes and one thousand dollars, and his expenses to Frankfort in Kentucky, where his brother lives, Lawson Sneed. After all my debts, accounts, &c. are settled, the balance, give to my four brothers and sister. Foster G. Crutcher has promised to attend to the settling of my estate. I have a note on him, which I give him for his trouble and expense. I claim on William B. Lewis, which I wish quietly settled. I purchased 486 acres of land in Williamson county, sold as the estate of Wm. Bennett, which I give notes for, and Burnett’s estate owes me. I wish the land sold and the balance when all is settled, give the balance to Mary Bennett and her son Thomas Bennett.
I have for years back been giving money and other things to my relatives, I cant tell how much I have given to each. I have given to some, lands, some, negroes, some, horses, dry goods, and a great deal of money, schooling to many and all expenses at school. I never kept accounts nor charged my relatives for it — always was glad I was able to do it, free of charge. I have given thousands of dollars away in assisting my poor relatives to live and raise their children, and be creditable in the world and be honest.
I have been security and have lost thousands. I have a note on Mrs. Juliet Henry for five hundred dollars, which I wish given up to her. It was given by her to me for furniture I had paid for at the Academy. It was a fraud on me in *379 the first place — though, as she is a poor woman, I give the note up to her — I am security for the rent of the house she lives in, and have four girls boarding with her.”
The paper has no signature.
It was proved under the act of October, 1784, ch. 10, sec. 5, to have been found at the death of Thomas Crutcher in the drawer of a bureau, amongst his valuable papers, in his room where he died at the Nashville Inn; that it was entirely in his hand writing, and that his writing was generally known by his acquaintances. These facts were attested by the number of witnesses required by the statute. Another paper of very similar character, dated August 24th, 1842, was also found in the same drawer folded in the form of a letter, and endorsed on it the word “memorandum,” it is marked B in this proceeding. In this paper the deceased said; “If 1 should die without making a will, Foster G. Crutcher has promised to act in settling my estate.”
It appeared that Thomas Crutcher was eighty-four years of age at his death; he came to Nashville in 1790, and resided in this city from that time; he had been for several years Treasurer of the State; was a man of good common sense, ordinary information, and perfect integrity; he was distinguished for his many benevolent acts towards his kindred and others who needed his assistance. He had never been married, and his kindred were his four brothers and sister who survived him, and the children of his deceased brothers Anthony, Isaac and William, and the children of Mrs. Sneed, a deceased sister; he had been in the habit of aiding and assisting the children of his deceased brother and sister, and was very kind to them; they were poor and nocessitUras.
He was in his usual health on the 25th of February, the date of the script propounded: the sickness of which he died on the 8th March, 1844, commenced about two days after the date of the script; but his illness was not of such character as to *380 disable him from making a will, if he had desired to do so; his physician visited him from the commencement of his sickness to the time of his death, and found him on several occasions sitting at his table apparently engaged in writing. During this period, he was visited by his eai’liest and most confidential friends. He never intimated to them that he had made or desired to make a will. On other occasions, he had stated in effect, that he did not desire to make a will. To Doctor Kelly, he said, “the law makes good enough will for meto James P. Clark, he said, “the law makes a better will than half the community can make — that it made a good enough will for himto John H. Eaton, who conversed with him several times about making a will, and offered to assist him in preparing it, sometime in the winter preceding his death, his uniform answers were, “that the law made a will quite good enough for him.” It does not appear that he ever stated to any person that he had made a will. The script in question, was an open paper, had never been folded, and though there were valuable papers with it, there were also many other loose papers of no value. He was very careless in keeping his papers, whether of value or no value. The list of his assets, real and personal, as set forth in said instrument, was very imperfect; it says he has several good notes, and it appears from an inventory of his estate, that there were solvent debts due him from various persons, to the amount of $15,329 36 cents; doubtful debts $7,255 36 cents; insolvent debts $4,606 6S; the cash on hand $3,086 51. His entire estate was supposed to be of the value of $60,000. Such are the leading facts of the case.
The court after having given a very just and proper construction to the act of 1784, under which the script is offered for probate, proceeded to say, that if they were satisfied its provisions had been complied with, the script was prima facie a valid will, unless it appear from the facts and circumstances *381 in proof before them, that the deceased did not intend it as his will; that it may be shown he did not so intend it, and it was competent for the jury to look at all the evidence, both intrinsic and extrinsic, so as to come to a just conclusion. That no special form is required to make a valid will; and that the question is, whether Thomas Crutcher intended this paper to operate as his will; if he did so intend, and all the requisites under the statute have been complied with, then you will find for the will; but if he did not so intend it, then you will find against the will, though the provisions of the statute have been complied with. The court further instructed the jury, that if the script propounded, was unfinished or incomplete, the presumption of law was against it as a will, but that this was a presumption merely, and if they should find, that the deceased intended the paper to be his will, in the condition it then was, it should be taken as his will, notwithstanding it was incomplete and unfinished. Such is a condensed statement of the material parts of the charge.
There were three mistrials, and at the fourth trial, the verdict was for defendants, and the plaintiff’s motion for a new trial, being overruled, he has appealed in error to this court.
In the first place, it is objected that the court erred in its instructions to the jury. Upon a careful examination of these instructions, we see nothing in them, to which the plaintiff can justly take exception. They are even favorable to the admission of the script as a valid will, for it will be observed^ that the court was of opinion, that the provisions of the statute being complied with, no formality was required for a will; that it need not have the signature of the writer; and that the only question was whether the script propounded was intended by the writer to be his last will and testament. Thus, in effect, the paper as it is, was considered sufficient in regard to its formality and construction; provided, the writer intended it to be a testamentary disposition of his property
*382 It is true, that the statute of Oct, 1784, ch. 10, sec. 5, does not require that the testator’s name shall be subscribed, if it be inserted in some part of the will; and in this respect, it differs from the statute of April 1784, ch. 22, sec. 11, which requires that the will shall be both signed and attested. These statutes, authorising the devise of real estate, contemplate as we may infer from the preamble, that the making of a will should be a well considered act, done upon deliberation, and not omitting due and proper form and ceremony. The signing and attestation of the will, is the mode of publication prescribed by the act of April 1784; the act of October 1784, recites “that it may be proper to make exceptions to that rule in particular cases;” and it prescribes a special case, which being complied with, in all its circumstances, will make the will valid without attesting witnesses, and even without signing, provided the name of the testator be inserted in some part of the will. It is not to be presumed, however, that it was the intention of the Legislature to apply t o devises of real estate, the .loose and latitudious doctrines of the ecclesiastical courts in reference to personal estate. The general intention on this subject is expressed in the act of April 1784, and that of October 1784, is to be regarded as an exception confined to the case expressly stated. Certainly no special form is necessary either in a will or in any other instrument known to the law, provided it contain sufficient matter of substance : but it may also be said, that no less formality should be permitted in a will .of real estate, than in any other instrument. It should manifestly appear that it is intended as a disposition of the testator’s lands, to take effect at his death; and it is evident, that this intention will best appear if the paper have the usual formality of a will.
In regard to personal bequests, Lord Hardwicke observed that, “there is nothing that requires so little solemnity, as the making of a will of personal estate, according to the ecclesi *383 astical laws, for there is scarcely any paper writing which they will not admit as such. Ross vs. Ewen, 3 Atk. R. 163; 1 Williams on Ex. 54.
We are not prepared by any means to apply this doctrine to devises of real estates. The usual formality of a will, is as well known as that of a deed or any other instrument; and if a man intend to write a will, it is not to be presumed that he will write it in the form of a deed or other instrument, or in the form of loose notes or memoranda; and though the dispositions it makes be not inproesenti, but testamentary in their character, such imperfect paper affords intrinsic evidence, by no means conclusive however, that the writer did not intend it as his will.
So, if the instrument propounded as a will be imperfect in-a technical sense, that is, if it appear in the body of the instrument that it is unfinished and incomplete, this raises a presumption that the writer did not intend the paper in that imperfect state tobe and to operate as his will.
And so, if it be not executed, that is, if it be not signed by the testator, or if there be an attestation clause and no attesting witnesses, from these omissions, a similar presumption arises against the paper as a will.
But these several presumptions against the validity of the paper as a will, may be rebutted and removed by proof satisfactory to the mind, that notwithstanding the informal character of the paper, or its unfinished state and condition, or its want of proper execution, yet, that it was intended in the form it appears and as far as it goes, to be the last will and testament of the deceased.
It is argued however, in the present case, that as the statute dispenses with the signature, provided the name of the deceased,be inserted in some part of the will, that no presumption should arise against its validity by- reason of the absence of such signature, the name of the writer appearing at the *384 commencement of the paper. The intention of the statute in this respect seems to be, that the mere absence of the signature shall not vitiate the paper as a will, if the name of the deceased appropriately and significantly appear in some part of the will.
Now in personal bequests, no signature is necessary to their validity, if it otherwise appear that a testamentary disposition was actually intended; and yet, if the paper have no signature, the presumption is against it as a testamentary paper, and must be removed by proof.
We can see no reason why the same principle should not apply with greater force indeed, to devises of real estate under this statute. If the paper be perfect in every other respect except that it is not executed or attested, the presumption against it dependent upon these circumstances alone, is a slight presumption, to be repelled by facts and circumstances, from which it may reasonably be inferred, that the deceased did, nevertheless, intend the paper to be his will.
It may be observed in regard to the signature, that it “consists both of the act of writing the party’s name and of the intention of thereby finally authenticating the instrument. 2 Greenl. Ev., sec. 674. Though it be not necessary under this act or in bequest of personalty that the paper be subscribed, yet “where there is no subscription, there is the absence of one of the strongest proofs that the paper is finished,” and that is the reason why effect is always given to that circumstance. Wood vs. Medly, 1 Haggard 645; Guthrie vs. Owen, 2 Hum. R. 216.
Where it appears on the face of the paper that it is imperfect, that is, unfinished, a strong presumption is raised against its validity as a will; because it is not to be presumed, that the deceased could intend such imperfect paper to operate as his will; and it requires strong and conclusive evidence to explain this circumstance, and to show that it was *385 really intended as far as it goes and in its. unfinished state, to be ihe will of the deceased. Johnson on Ev. 53.
In Robison va. Kea, Ruffin, C. J., observes, that there is a presumption, that a paper, which upon its face is imperfect, has not been published as a will, or was not intended by the maker of it to operate in the condition in which it is. This presumption, will be more or less strong, according to the degrees of the imperfections. If the paper be not signed, or if it be not finished, that is, not written out- to express all the gifts the testator means to make, leaving for instance a part of his property undisposed of; or if another paper, (though imperfect also,) be written at the same time or afterwards, containing new and inconsistent dispositions, or theparty from time to time make alterations and additions, without appointing executors or coming to a conclusion; in such, and many other cases which might be stated, the inference is, that he never-published the particular paper, or intended conclusively, in case of immediate death, his estate to be enjoyed according to it.”
After remarking that such paper may be regarded as containing “heads, memoranda and a general outline” of a will to be yet further altered and completed; and that a similar ■presumption, though much weaker, arises from want of date or attestation, where it appears it was intended to be attested, 0. J. Ruffin proceeds to say, that the question in such a case, is not about the animus testandi as in that paper; but as to the animus testandi by that paper; in other words, it is reduced to the naked enquiry of publication as it is technically called.”
We may further observe, that if a testamentary paper be found amongst the valuable papers of the deceased, and be proved in the manner required by the act of October 1784, these circumstances are equivalent to an express publication before witnesses, because it is to be inferred • from them that
the party intended to give effect to the paper as his wall. The *386 construction of the paper as to its testamentary character and the formality of its execution, is a question of law for the court, and hence the court may be able to pronounce upon the paper, that if it were intended by the writer to be a testamentary disposition of his property, it shall have that effect.
But although it may appear in the proof of the script propounded, that the requisites of the statute have been, in all respects complied with, and although such compliance will raise the presumption prima facie, that the writer intended the paper as his will; yet, this presumption may be repelled by intrinsic and other proof, and it may be shown that there was an absence at its execution of the animus testandi, or if that intention were present, that the writer did not intend by that particular script to make a final disposition of his estate; as if it were merely notes or memoranda, or other imperfect and unexecuted paper deliberative in its character, and from -which he intended to prepare his will or to have it prepared; holding it at the same time subject to such changes and alterations, as upon further reflection, he might deem expedient and proper; or if perfected and executed by the writer, that it was done for some other purpose and not for a will, as in the case of Nichols vs. Nichols, 2 Phillimore 180; or that the writer had not sufficient reason or capacity to make a will; or that it was made under duress or obtained by fraud. The great requisite of a will is the animus testandi, not in any general sense, but in reference to the script propounded as a will. In the case in 2 Phillimore 180, referred to, Sir John Nichol observes, that “a witness attests a will for the purpose of giving authenticity to the factum of the instrument; the animus testandi is the very point into which the court of probate is to enquire — the mere act of witnessing or signing does not exclude, of necessity, the absence of the animus testandi, any more than the mere act of cancellation excludes of necessity the absence of the animus revocandi. It may have been signed under duress, or *387 under other circumstances where there was no intention to make a testamentary disposition.” With much greater force will these observations apply, when the paper is imperfect or not executed, or is informal and inartificial in its character, as to render it difficult to say, whether it was intended as a deed or a will, or as mere notes and memoranda for a will. Sims vs. Sims, 5 Iredell Law R. 684; St. Johns Lodge vs. Callender, 4 Ird. L. R. 335; 4 Kent’s Com. 532, margin.
In the next place it is insisted, that the verdict is not supported by the evidence; and it is argued that cases arising upon the issue devisavit vel non, being in the nature of proceedings in rem, should form an exception to the general rule of the court on the subject of new trials, and be determined by this court upon a mere preponderence of proof, as in other issues of fact.
We cannot perceive any just ground, upon which to place such an exception; the fact, that the case is in nature of a proceeding in rem, does not seem to be material in reference to the question. It only proves, that any person interested may become a party to the contest, and have leave to take such position in it, as his interest may demand ; the judgment of the court, in such case, is in general conclusion not only upon the actual parties to the proceeding, but all others who might have become parties.
The case of Pettett's exrs. vs. Pettitt, 4. Hum. R. 193, was upon an issue devisivil vel non. After stating certain facts, tending to support the verdict, Reese, J., who delivered the opinion of the court, says: “we have selected this testimony from the record to show, that there was proof before the jury, upon which their verdict against the validity of the alleged testamentary paper, may be rested. On the. other hand, there is much testimony, that tends to show, that the deceased was of sound and disposing mind and memory. In such cases, where the circuit court has refused a new trial, the well *388 settled and inflexible rule of this court is, to suffer the verdict to remain, where there is any testimony to sustain it, unless there be error in matters of law.” We see no reason to modify this rule, orto make any exceptions to it, but on the contrary, it must be regarded in the language of Judge Reese, as “settled and inflexible.”
Now to apply this principle to the present case : was there proof before the jury upon which the verdict might be rested? We have no hesitation in saying, that in our opinion there was. It is to be found, in part, in the facts and circumstances before recited, and in the nature and character of the script itself, propounded as the will. It appears from the record, that there were three mis-trials, and it was not until the fourth trial, that a jury could find a verdict upon the facts ; this is certainly an indication that the case was pretty well balanced upon the facts. The script itself contains much intrinsic evidence against its validity as a testamentary paper; it does not purport to be a will, and is not executed; the name of the writer, it is true, appears in the paper, but more in connexion with an inventory of his estate, than in that of any testamentary disposition of it. The list of the property which it professes to give, is imperfect to a large amount; it appoints no executor; the statement that Foster C. Crutch-er had promised to settle his estate, is contained also in exhibit B., where he makes the same statement, with the addition that he had so promised, if the writer should die without a will. That is, also, an indication that he did not consider exhibit B. as a will, and yet it is very similar to the script propounded. If the deceased had any testamentary intentions, there was no reason why he should not have executed them; he had ample time and opportunity to do so, and was entirely capable until just before his death. But he expressly repels any such supposed intentions by repeated declarations that he did not wish to make a will; that the law *389 made a will good enough for him. Considering his condition in life, alone and without any family, his equally 'kind relations with all his kindred; and his benevolent character, we do not see that he could have any particular motive to make a will, or to make a disposition of his estate different from that, which the law would make. If he had so intended, there seems no sufficient reason why he should disguise it, or deny it to his most ancient and confidential friends. We conclude, therefore, that there is ample proof to support the verdict, and that it cannot be disturbed, without violating a well settled rule of the court.
Let the judgment be affirmed.